241 F.3d 194 (2nd Cir. 2000)
 In Re: MARIA AGUINDA and GABRIEL ASHANGA JOTA, Petitioners,
MARIA AGUINDA, GABRIEL ASHANGA JOTA, PAULA NERIDA ASHANGA CASTENO, CHIRSTIAN ASHANGA CASENO, JUDITH REUTEGUI CASTENO, MANUEL ANTONIO CANELOS, individually
and as guardian for his children, ALIMPIO COQUINCHE NOTENO, ARSENIO CONDO, JUAN MARCOS COQINCHE MERCIER, RONALD CONQINCHE NOTENO, individually and as guardian for Tarcila Coquiniche and Saul Coquinche, TARCILA CONQUINCHE, SAUL CONQUINCHE, SANTIAGO CONQUINCHE, individually and as guardian for Julian Conquinche and Santiago Conquinche, JULIAN COQUINCHE, SANTIAGO COQUINCHE, FLORENTINO NOTENO, Florentino Noteno, individually and as guardian for Mery Noteno, Greine Noteno, Armilda Noteno and Noris Noteno, MERY NOTENO, GRIENE NOTENO, ARMILDA NOTENO, NORIS NOTENO, REMEDIA PAZ DUENDE, individually and as a guardian for Lizzie Pena Paz, Jackie Pena Paz individually and on behalf of all others similarly situated, LIZZIE PENA PAZ, JACKIE PENA PAZ, ASSOCIACION INTERNICA DE DESARROLLO DE LA SELVA PERUANA AIDESEP,(MULTI ETHNIC ASSOCIATION OF THE DEVELOPMENT OF THE PERUVIAN RAINFOREST), in representation of its members and of its member organizations, ORGANIZACION KICHUARUNA WANGURINA - ORKIWAN, (ORGANIZATION QUICHUA WANGURINA), FEDERACION DE COMUNIDADES NATIVAS DEL MEDIO NAPO - FECONAMN, (FEDERATION OF NATIVE COMMUNITIES OF THE MIDDLE NAPO) and FEDERACION DEL PUEBLO YAGUA DEL BAJO AMAZONA Y BAJO NAPO - FEPYBABAN (FEDERATION OF THE YAGUA PEOPLE OF THE LOWER AMAZON AND LOWER NAPO), MARK AGUINDA, Individually, and as guardian for Gesica Grefa, CARLOS GREFA, Individually and as guardian for Gesica Grefa, GESICA GREFA, CATARINA AGUINDA, MERCEDES GREFA, LIDIA AGUINDA, PATRICIO CHIMBO, individually and as guardian for his minor children, ELIAS PIYAGUAJE, Individually and as guardian for Lola Piyaguaje, Edison Piyaguaje, Paulina Piyaguaje, Jimena Piyaguaje and Elias Piyaguaje, LOLA PIYAGUAJE, EDISON PIYAGUAJE, PAULINA PIYAGUAJE, JIMENA PIYAGUAJE, ELIAS PIYAGUAJE, DELFIN PIYAGUAJE, Individually and as guardian for minor children, JAVIER PIYAGUAJE, HOMER CONE, Individually and as guardian for his minor children, SANTO GUILLERMO RAMIEREZ, Individually and as guardian for Danilo Ramierez, DANILO RAMIEREZ, JUANA TANGUILA, ADDITIONAL PLAINTIFF, LISTED IN EXHIBITS "B", "C" AND "D" HERETO AND INCORPORATED HEREIN BY REFERENCE, Individually and on behalf of all others similarly situated, Plaintiffs Petitioners,
v.
TEXACO, INC., Defendant-Respondent.
 Docket No. 00-3066
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Submitted: October 24, 2000
 Decided: February 23, 2001
 
 Petition for a writ of mandamus directing Judge Jed S. Rakoff of the United States District Court for the Southern District of New York to recuse himself in the underlying action. Petitioners argue that the judge's attendance at an expense-paid seminar funded by nonprofit foundations but sponsored by an organization that received some general funding from defendant-respondent Texaco and at which a former chief executive officer of Texaco spoke created an appearance of partiality towards Texaco that requires disqualification. Given the fact that the topics discussed at the seminar had no bearing on any issue material to the disposition of a claim or defense in this case and the remote involvement of Texaco in the seminar, we deny the petition.[Copyrighted Material Omitted]
 CRISTOBAL BONIFAZ (John C. Bonifaz and Steven Donziger, of counsel), Amherst, MA (Joseph Kohn and Martin D'Urso, Kohn, Swift & Graf, Philadelphia, PA, and Amy Damen, Sullivan & Damen, White Plains, N.Y., of counsel), for Petitioners.
 RICHARD L. HERZ, EarthRights International, Washington, DC (J. Martin Wagner, Earthjustice Legal Defense Fund, San Francisco, CA, of counsel), for Amici Curiae EarthRights International and the Sierra Club in support of Petitioners.
 Before: CARDAMONE, WINTER, and POOLER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Petitioners seek a writ of mandamus directing Judge Rakoff to recuse himself in the underlying action. See Aguinda v. Texaco, Inc., Nos. 93 Civ. 7527, 94 Civ. 9266 (S.D.N.Y.). That action involves claims by plaintiffs, who are citizens of Ecuador and Peru, that the defendant -- here respondent -- Texaco, Inc., polluted rain forests and rivers in those two countries, causing environmental damage and personal injuries.
 
 
 2
 This is the second time a proceeding in this matter has been before us. In 1996, Judge Rakoff dismissed the complaint on the grounds of international comity, forum non conveniens, and the failure to join indispensable parties. See Jota v. Texaco, Inc., 157 F.3d 153, 157 (2d Cir. 1998); Aguinda v. Texaco, Inc., 175 F.R.D. 50, 50 (S.D.N.Y. 1997) (denying motions for intervention and reconsideration). On appeal, we vacated the judgment and remanded for further proceedings. See Jota, 157 F.3d at 158-63.
 
 
 3
 The issue now before us arises from Judge Rakoff's attendance at an expense-paid seminar on environmental issues during the period between his dismissal of the case and our remand. Petitioners argue that because Texaco contributed general funding to the organization that sponsored the seminar and a former Texaco chief executive officer was a speaker at the seminar, an appearance of partiality warranting disqualification was created. Judge Rakoff denied petitioners' motion essentially on the grounds that Texaco provided only minor general funding to the seminar's sponsor, nonprofit foundations funded the seminar itself, and neither the former Texaco CEO nor any other presenter at the seminar discussed any issues material to the merits of the underlying case. See Aguinda v. Texaco, Inc., No. 93 Civ. 7527 (S.D.N.Y. Sept. 5, 2000) (unpublished order); Jota v. Texaco, Inc., No. 94 Civ. 9266 (S.D.N.Y. Sept. 5, 2000) (unpublished order) [both hereinafter denoted as Order].
 
 
 4
 We hold that Judge Rakoff did not abuse his discretion in denying petitioners' motion. Given Texaco's indirect and minor funding role and the lack of a showing that any aspect of the seminar touched upon an issue material to the disposition of a claim or defense in the present litigation, we deny the petition.
 
 BACKGROUND
 
 5
 The present petition is based almost entirely on a July 2000 publication, offered as part of petitioners' recusal motion in the district court, by an organization named the Community Rights Counsel ("CRC"). The publication was entitled Nothing for Free: How Private Judicial Seminars Are Undermining Environmental Protections and Breaking the Public's Trust [hereinafter CRC Report]. Its highly critical focus was on three organizations that offer "privately funded" seminars for judges: the Law and Economics Center ("LEC"), which is affiliated with George Mason University; the Foundation for Research on Economics and the Environment ("FREE"); and the Liberty Fund, which is affiliated with the Manhattan Institute's Center for Legal Policy.[1] FREE is the particular target of the CRC Report.
 
 
 6
 The CRC Report claims that "the marketplace of privately funded judicial education is overwhelmingly dominated by pro-market, anti-regulatory seminars offering a single and unchallenged line of reasoning" and that the "'Big Three' [LEC, FREE, and Liberty Fund]... share a remarkably similar, and in some respects extreme, conservative/libertarian ideology." CRC Report, at 2. It further alleges that these seminars are offered in luxurious settings and funded by corporate donors who hope to obtain favorable judicial decisions as a result of judges attending these seminars. Id. at 1, 7. The CRC Report has attracted much attention from the media. See, e.g., A Blot on Judicial Ethics, Wash. Post, July 28, 2000, at A24; Jim Drinkard, Advocacy Groups Pay for Judges' Seminars, USA Today, July 25, 2000, at 6A; Abner Mikva, Editorial, The Wooing of Our Judges, N.Y. Times, Aug. 28, 2000, at A17; A Threat to Judicial Ethics, N.Y. Times, Sept. 15, 2000, at A34.[2]
 
 
 7
 Turning specifically to the present matter, petitioners assert that Judge Rakoff must recuse himself because he attended an expense-paid seminar sponsored by FREE from September 15 through September 20, 1998, at a ranch in Montana. They note that Texaco provides funding to FREE and that a former chief executive officer of Texaco was a speaker at the seminar. The seminar was entitled, "Real and Alleged Environmental Crises -- A Seminar for Federal Judges." Petitioners state that the topics of the seminar were "directly related to the issues bound to arise in the course of [their] litigation." Brief for Petitioners at 13. To support this claim, petitioners point to the titles of six of the eleven sessions. These titles were: "Session II: Scientific Arguments and Their Context: An Introduction to Proof, Cause and Their Use (and Misuse) in Public Policy"; "Session IV: Applying More Good than Harm: Principles in Environmental Decision Making"; "Session VI: It Ain't Necessarily So: Two Case Studies of (Alleged) Health Risks and the Power of the Press"; "Session VII: The Environment: Some Thoughts from the Corner Office"; "Session IX: The Coming Battleground: Estrogenic Chemicals, Campaigns of Alarm, and Precautionary Pitfalls"; and "Session X: Risk Ledger -- A Balancing Act." It was the seventh session, entitled "The Environment: Some Thoughts from the Corner Office," at which Alfred C. DeCrane, Jr., the retired chairman and chief executive officer of Texaco, spoke. Petitioners argue that Judge Rakoff's attendance at the seminar (after he had dismissed the case but before the remand) created an appearance of partiality and that, therefore, he is disqualified from presiding on the remand proceedings.
 
 
 8
 In denying the motion for disqualification, Judge Rakoff noted that Texaco did contribute to FREE but that the contributions comprised a "minor" portion of FREE's general funding.[3] He also noted that the seminar itself was funded by two nonprofit organizations that are strangers to this litigation.[4] See Order at 3. Finally, the judge stated that none of the discussions in the formal sessions or in informal conversations related to legal issues arising in the litigation. See id. at 3-4. Petitioners concede a lack of knowledge of the actual contents of the various discussions.
 
 DISCUSSION
 
 9
 a) Legal Standards
 
 
 10
 We review a denial of a recusal motion for abuse of discretion. See In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1312 (2d Cir. 1988) ("The judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion."). Therefore, in reviewing a petition for a writ of mandamus,
 
 
 11
 we must bear in mind not only the standards governing recusal, but we must also consider the extraordinary showing required to obtain the issuance of a writ of mandamus.... [P]etitioners must "clearly and indisputably" demonstrate that the district court abused its discretion. Absent such a showing, mandamus will not lie.
 
 
 12
 Id. at 1312-13; accord Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 18 (1983) (holding that writ of mandamus is an "extraordinary writ" that will issue only where petitioner establishes "his right to the writ is clear and indisputable").
 
 
 13
 Section 455 of the United States Judicial Code governs the recusal of federal judges. Subsection (a), which was added to the statute in 1974,[5] provides "an entirely new 'catchall' recusal provision." Liteky v. United States, 510 U.S. 540, 548 (1994). It reads:
 
 
 14
 Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 
 
 15
 28 U.S.C. § 455(a). The Supreme Court has stated:
 
 
 16
 The goal of section 455(a) is to avoid even the appearance of partiality. If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible.
 
 
 17
 Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 860 (1988) (quoting Health Servs. Acquisition Corp. v. Liljeberg, 796 F.2d 796, 802 (5th Cir. 1986)).
 
 
 18
 Also of relevance are the statute and ethical guidelines governing the receipt of gifts by federal judicial officers. The Ethics Reform Act of 1989, Pub L. No. 101-194, 103 Stat. 1716, prohibits gifts to, among others, federal judges from any person "seeking official action from, doing business with,... or whose interests may be substantially affected by the performance or nonperformance of the individual's official duties." Id. § 303(a) (codified at 5 U.S.C. § 7353 (1994)). The Ethics Reform Act further provides that the supervising ethics office of each branch may issue rules implementing the Section and provide for "reasonable exceptions." Id.
 
 
 19
 The United States Judicial Conference Committee on Codes of Conduct has issued guidelines that specifically address whether a judge's expense-paid attendance at a seminar constitutes an improper gift. The guidelines are contained in Advisory Opinion No. 67, first issued in 1980 and revised and reissued in 1998. It states in pertinent part:
 
 
 20
 Payment of tuition and expenses involved in attendance at non-government sponsored seminars constitutes a gift....
 
 
 21
 The education of judges in various academic disciplines serves the public interest. That a lecture or seminar may emphasize a particular viewpoint or school of thought does not in itself preclude a judge from attending. Judges are continually exposed to competing views and arguments and are trained to weigh them.
 
 
 22
 It would be improper to participate in such a seminar if the sponsor, or source of funding, is involved in litigation, or likely to be so involved, and the topics covered in the seminar are likely to be in some manner related to the subject matter of such litigation.
 
 
 23
 Administrative Office of U.S. Courts, Codes of Conduct for Judges and Judicial Employees, in Guide to Judiciary Policies and Procedures [hereinafter Codes of Conduct] IV-151 (1999). Application of these various guideposts is not mechanical but requires an exercise of reasoned judgment. They must be applied in an adversarial context in which counsel will seek to steer cases to judges deemed favorable to their cause -- in the lexicon of the profession, "judge-shopping." As a result, the grounds asserted in a recusal motion must be scrutinized with care, and judges should not recuse themselves solely because a party claims an appearance of partiality. Section 455's legislative history itself cautioned:
 
 
 24
 [D]isqualifcation for lack of impartiality must have a reasonable basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.
 
 
 25
 S. Rep. No. 93-419, at 5 (1973); H.R. Rep. No. 93-1453 (1974), reprinted in 1974 U.S.C.C.A.N. 6351, 6355.
 
 
 26
 We have similarly reminded litigants that Section 455(a) requires a showing that would cause "an objective, disinterested observer fully informed of the underlying facts [to] entertain significant doubt that justice would be done absent recusal." United States v. Lovaglia, 954 F.2d 811, 815 (2d Cir. 1992). "Where a case, by contrast, involves remote, contingent, indirect or speculative interests, disqualification is not required." Id. Moreover, where the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited. As we have stated, "[a] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." Drexel Burnham Lambert, 861 F.2d at 1312.
 
 
 27
 Finally, with regard to the appearance of partiality, the appearance must have an objective basis beyond the fact that claims of partiality have been well publicized. As we have cautioned with specific regard for the application of Section 455(a):
 
 
 28
 That which is seen is sometimes merely a smokescreen. Judicial inquiry may not therefore be defined by what appears in the press. If such were the case, those litigants fortunate enough to have easy access to the media could make charges against a judge's impartiality that would effectively veto the assignment of judges. Judge-shopping would then become an additional and potent tactical weapon in the skilled practitioner's arsenal.
 
 
 29
 Drexel Burnham Lambert, 861 F.2d at 1309. The test, as we have stated, is one of reasonableness, and the appearance of partiality portrayed in the media may be, at times, unreasonable. In such cases, the requirements of Section 455(a) are not met.
 
 
 30
 In addition, courts also must distinguish between ordinary appeals based on allegations of a judge's partiality and petitions -- like the one in this case -- for writs of mandamus. In that regard, we have noted that mandamus petitions seeking disqualification must satisfy an "exacting standard," In re Int'l Bus. Machs. Corp., 45 F.3d 641, 643 (2d Cir. 1995), and demonstrate that the right to the writ is "clear and indisputable." Id.(quoting Moses H. Cone, 460 U.S. at 18).
 
 
 31
 b) The Merits
 
 
 32
 In addressing the merits, we write at some length even though the outcome is not in doubt. The principle set forth by petitioners is fairly sweeping and calls for a discussion commensurate with its breadth. Moreover, the issues raised by petitioners are serious and have implications regarding public confidence in the judiciary. It is, therefore, important that judges have some general guidance as to when attendance at meetings, seminars, or other presentations may be problematic. Judges should not forgo important educational opportunities where no impropriety can be perceived. However, judges' participation in such events in certain circumstances is ill-advised, and we add some cautionary notes in that regard.
 
 
 33
 Petitioners' showing is rather more limited than they claim. They have established that Judge Rakoff attended a seminar that was funded by nonprofit organizations that are not parties to the underlying litigation. The seminar was sponsored by an organization, FREE, that receives a small portion of its general funding from Texaco, and a former CEO of Texaco spoke at the seminar. Petitioners state that the seminar had, or might have appeared to a reasonable person to have had, a pro-development, anti-environmental-protection slant with which many would disagree. They have not, however, identified any legal issue material to the disposition of a claim or defense in the underlying litigation that was discussed, either favorably or unfavorably to their cause, at the seminar. Nor have they shown that the judge had any informal conversation bearing on such an issue. To the contrary, the judge has stated that neither the seminar discussions nor informal conversations had any such bearing.[6]
 
 
 34
 We turn now to the application of the legal guideposts described above to petitioners' showing. We conclude that the district judge did not abuse his discretion in denying the motion for disqualification.
 
 
 35
 With regard to Texaco's provision of a minor portion of FREE's general funding, no reasonable observer would believe that such funding would influence a seminar-attending judge's decision in litigation involving Texaco. Rather, such an observer would regard the donation to FREE as far too remote to create a plausible suspicion of improper influence. See Lovaglia, 954 F.2d at 815.
 
 
 36
 Judges are provided meals and often lodging by, inter alia, bar associations and law schools that are funded by donors who appear before the judges as parties or as counsel to parties. At bar association dinners, tables to which judges are assigned (by the association) as paid guests may be funded by particular law firms. Many law schools establish centers or projects to focus academic work on certain areas of the law and fund them through -- often large -- donations from -- often small numbers of -- alumni and others professionally active in the particular areas. Such centers or projects often conduct seminars, symposia, or workshops to which judges are invited and that provide meals and often lodging.
 
 
 37
 Academic institutions may also conduct programs to train judges whose expenses are paid. For example, the University of Virginia and New York University routinely sponsor seminars for judges that may cover topics involving issues that are involved in litigation. See NYU Law, NYU Hosts Workshop For Federal Judges, The Law School Magazine, Autumn 2000, at 88 (describing "Workshop on Employment Law for Federal Judges"); Rector & Visitors of the University of Virginia, University of Virginia School of Law: Programs & Centers (2000), at http://www.law.virginia.edu (describing "Graduate Program for Judges"). Such institutions nevertheless raise private funding from persons or entities that are parties to litigation or counsel to parties.
 
 
 38
 No reasonable person would believe that expense-paid attendance at such events would cause a judge to be partial, or to appear so, in litigation involving a minor donor -- whether a party or counsel to a party -- to a bar association, law school, or program administering a particular seminar. Were we to take a different view, judges would as a practical matter either have to recuse themselves in a vast number of matters or decline invitations to numerous events of an entirely innocent nature that are of importance to the judiciary, the profession, and legal education. We therefore conclude that Section 455(a) did not require Judge Rakoff's recusal solely because of Texaco's donation of minor general funding to FREE. For similar reasons, we also conclude that it did not constitute a gift by Texaco to Judge Rakoff within the meaning of Section 303(a) of the Ethics Reform Act.
 
 
 39
 Indeed, in fairness to petitioners, we do not understand them to claim seriously that Texaco's provision of some minor funding to FREE by itself mandates recusal. We dispose of such a claim only out of an abundance of caution. The claim they do press seriously arises from the appearance they believe is created by the combination of: (i) Texaco's provision of minor general funding to an organization that (ii) sponsored a seminar for judges funded by non-parties that (iii) presented an "unbalanced" view on general environmental policy issues. However, we conclude that these circumstances also do not warrant recusal.
 
 
 40
 Although views differ on the merits and fairness of FREE's environmental seminars,[7] we accept for purposes of the present analysis the allegation that the FREE seminar attended by Judge Rakoff was "unbalanced." Indeed, we have little choice. A determination that a presentation on policy issues is unbalanced must be based on establishing a set of parameters defining "balance" that in turn requires a weighing of the intellectual significance of differing positions on controversial issues. This weighing involves judgments resembling content regulation that are not appropriate for courts. A determination that a presentation is balanced depends so heavily on each individual's view as to whether his or her position on the issue is prominently featured that a search for a consensus as to what is a balanced presentation of a particular issue is almost chimerical. If the subject is controversial, some will inevitably say that a presentation on it is unbalanced. A court addressing a recusal motion should, therefore, accept a claim of lack of balance at least for purposes of determining whether an appearance of impropriety has been created.
 
 
 41
 Nevertheless, so long as: (i) a presentation does not relate to legal issues material to the disposition of a claim or defense in an action before a judge who attended the presentation, (ii) the funding by a party of a seminar's sponsor is too remote or minor to appear to a reasonable person to have an influence on the judge, and (iii) the nature of a party's funding of a sponsoring organization does not create an appearance of either control or impropriety, as discussed infra, no reasonable observer would believe that judges are subject to what amounts to brainwashing of a kind that would affect the outcome of such litigation. Even if a judge were persuaded by the FREE seminar that our environmental laws are on balance harmful in many respects, the presumption is that a judge will put personal beliefs aside and rule according to the laws as enacted, as required by his or her oath. See, e.g., United States v. Cooley, 1 F.3d 985, 993 & n.4 (10th Cir. 1993) (requiring disqualification); United States v. Sturman, 951 F.2d 1466, 1482 (6th Cir. 1991) ("All judges, as part of their decisionmaking process seek to set [personal] feelings aside."). In such circumstances, the imbalance of a seminar involves no more of an objective appearance of partiality than does that appearance created by the fact that every judge inevitably has opinions on the controversies of the day. See, e.g., Laird v. Tatum, 409 U.S. 824, 830-36 (1972) (memorandum of Rehnquist, J.); United States v. Bauer, 84 F.3d 1549, 1560 (9th Cir. 1996). Indeed, persons who have held elective office often become judges, and they are not recused from administering laws in whose enactment, in their prior capacity, they participated. See, e.g., Laird, 409 U.S. at 831-32 (noting past Supreme Court justices who sat on cases involving legislation they drafted or issues they decided as political figures); United States v. Alabama, 828 F.2d 1532, 1543-44 (11th Cir. 1987) (per curiam) (holding judge's background as civil rights lawyer and state legislator did not mandate disqualification of judge ordering desegregation, but that other factors did); Shaw v. Martin, 733 F.2d 304, 316 (4th Cir. 1984) ("One who has voted as a legislator in favor of a statute permitting the death penalty in a proper case cannot thereafter be presumed disqualified to hear capital cases as a judge or predisposed to give a death sentence in any particular case.").
 
 
 42
 Moreover, petitioners' view would commit courts addressing recusal motions to the unraveling of every contact a judge has had with a general subject matter and the weighing of the likelihood that the contact influenced his or her views on the subject. For example, the district judge in the present matter also attended a seminar whose speakers espoused a view of public international law that was in a general way close to that of petitioners, a contact that was arguably more closely related to claims and defenses in the underlying case than the FREE seminar. See supra Note 6. Moreover, federal judges routinely receive free copies of books, journals, magazines, and other publications that discuss disputed policy issues without any imputation until now that, if they read some of the unsolicited materials, they are thereafter recused on any matter connected with those issues. Even if possible, therefore, assessing the impact of any single presentation on the thinking of a judge is neither necessary nor useful.
 
 
 43
 Finally, as the Judicial Conference Advisory Opinion notes, the acquisition of general information is vital to judges, see Codes of Conduct, at IV-151, and we see little reason to adopt a rule with no beneficial effect that would deter judges from seeking to educate themselves in various disciplines. This is particularly the case in an age in which specialized knowledge is important to the exercise of the judicial function. As Judge Jack Weinstein has written, "[a]s generalists, [judges] need to continue to acquire general information.... We cannot make intelligent fact decisions or evaluate the effect of our legal decisions on society unless we have some understanding of that society." Jack B. Weinstein, Limits on Judges Learning, Speaking and Acting - Part I - Tentative First Thoughts: How Many Judges Learn?, 36 Ariz. L. Rev. 539, 541 (1994). Moreover, the Committee on Codes of Conduct has specifically stated, in its Advisory Opinion No. 67, that the "education of judges in various academic disciplines serves the public interest. That a lecture or seminar may emphasize a particular viewpoint or school of thought does not in itself preclude a judge from attending. Judges are continually exposed to competing views and arguments and are trained to weigh them." Codes of Conduct, at IV-151; see also United States v. Bonds, 18 F.3d 1327, 1328-39 (6th Cir. 1994) (denying recusal motion where circuit judge attended University of California conference on forensic use of DNA where government expert defended his own trial testimony that resulted in convictions on appeal).
 
 
 44
 A holding that an appearance of partiality was created in the present circumstances would as a practical matter mean that attendance by a judge at any presentation on a debated issue might lead to recusal, at least where a party or counsel to a party has provided any financial support, no matter how minor or remote.[8] A vast array of educational opportunities for judges would thereby be indiscriminately foreclosed, or recusals would become routine. Moreover, as Judge Weinstein's essay indicates, the universe of seminars and other presentations available to judges extends far beyond the three organizations that are the focus of the CRC Report, see Weinstein, supra, at 543-55, and the subjects treated range widely over, inter alia, various social and hard sciences, technological issues, and statistical analyses, see id. at 548-49 nn. 55-58, 60-63.
 
 
 45
 The CRC Report understates the dimensions of the implications of its argument that judges cannot be funded in any way in attending such presentations unless that funding is provided exclusively by public sources. See CRC Report, at 103-05. Such a rule would have significant negative effects without any serious benefits. It might also have constitutional implications.
 
 
 46
 Moreover, Judge Weinstein has pointed out that limiting judges to seminars sponsored exclusively by governmental bodies may lack balance:
 
 
 47
 [R]eliance entirely on government agencies has its own dangers. The view of a government agency may itself be slanted. As an example, there may be a tendency of some in the federal establishment to close the courthouse doors by an ideological bent toward procedural and other restrictions. The Justice Department, the major federal litigator, has definite views that vary with different administrations and that are reflected in federal policies.
 
 
 48
 Weinstein, supra, at 548 (footnote omitted).[9]
 
 
 49
 We add several cautionary notes, however. In particular, we caution judges that recusal may be required after accepting meals or lodging from organizations that may receive a significant portion of their general funding from litigants or counsel to them -- whether or not in connection with an unbalanced presentation. The extent of funding is, of course, again a matter of judgment, but accepting something of value from an organization whose existence is arguably dependent upon a party to litigation or counsel to a party might well cause a reasonable observer to lift the proverbial eyebrow.
 
 
 50
 Moreover, where a presentation concerns issues material to the disposition of litigation or involves parties, witnesses, or counsel in particular actions, the recusal calculus will differ, albeit again without an applicable mechanical standard. Presentations at bar association meetings or law schools may well relate to particularized issues, and recusal should be considered seriously, but on a case-by-case basis. Judges should be wary of attending presentations involving litigation that is before them or likely to come before them without at the very least assuring themselves that parties or counsel to the litigation are not funding or controlling the presentation. See In re Sch. Asbestos Litig., 977 F.2d 764, 781-85 (3d Cir. 1992) (issuing writ of mandamus directing recusal where district judge approved ex parte request by plaintiffs to use money from settlement fund to pay indirectly for conference about crucial scientific issue in that litigation, where plaintiffs' proposed expert witnesses presented their views, and where judge also attended conference with many expenses paid). Where parties or counsel to them fund or control such a presentation, the appearance created bears too great a resemblance to an ex parte contact.
 
 
 51
 Another distinction is of importance where a claim of an appearance of partiality is made. A recusal-causing appearance must be based on the facts of the presentation involved and not on the amount of publicity partisans on the particular issues can muster. As we noted above, litigants have an incentive to judge-shop, and a judge should not grant a recusal motion simply because a claim of partiality has been given widespread publicity. See Drexel Burnham Lambert, 861 F.2d at 1309. To do so would unfairly allow those with access to the media to judge-shop. In the present matter, petitioners seek to benefit from CRC's rather ample access to the media. Having said that, however, recusal may be required where judges attend presentations -- expense-paid or not -- and there is reason to believe that the sponsor solicits funds by suggesting to donors that the outcome of litigation in which donors are involved may be affected. In such a case, the appearance of partiality is created by the sponsor itself, unlike the present case in which the appearance is based solely on publicity generated by critics rather than underlying facts.
 
 CONCLUSION
 
 52
 Because a reasonable person would not doubt the judge's impartiality in this case, we hold that neither Section 455(a) nor any other rule requires or permits his disqualification. We therefore deny the petition.
 
 
 
 NOTES:
 
 
 [1]
 The CRC Report appears to use "privately funded" to mean not funded exclusively by federal congressional appropriations. For example, LEC's sponsoring organization is a state university, although both the university and LEC likely solicit and receive funding from non-state sources.
 
 
 [2]
 Similar criticism has been voiced in the past. In 1993, for example, an organization named Alliance for Justice published Justice for Sale: Shortchanging the Public Interest for Private Gain, which critized programs such as George Mason's LEC and challenged attendance by judges at seminars where the audience is not limited to judges. In particular, it challenged civil liability conferences at Yale Law School attended by practitioners and academics as well as judges. See Justice for Sale, at 70-79; see also Jack B. Weinstein, Limits on Judges Learning, Speaking and Acting -- Part I -- Tentative First Thoughts: How Many Judges Learn?, 36 Ariz. L. Rev. 539, 545, 565 (1994) (discussing conferences at Yale and New York University funded by Aetna and finding merit in such seminars, but proposing guidelines to ensure impartiality).
 
 
 [3]
 The record contains a tax document indicating that Texaco's contributions to FREE in 1998 and 1999 ranged from 3% to 6% of total reportable contributions. What other income FREE has, whether by gift, interest, or other source, is unknown. Whether FREE has other assets is also unknown.
 
 
 [4]
 Petitioners argue that FREE's literature stating that the seminar was supported by the two nonprofit organizations does not exclude the possibility that FREE also used general funds to pay for the seminar. However, the plain implication of FREE's literature is otherwise, and, because petitioners bear the burden of establishing the grounds for issuing a writ of mandamus, their failure to show the use of general funds precludes such a finding. In addressing this argument we offer no view on whether Texaco's provision of minor general funding would alter the outcome if general funding were used to finance the seminar.
 Judge Rakoff also stated that he did not know that FREE had received funds from Texaco prior to petitioners' motion. His lack of knowledge, however, is irrelevant in light of Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847 (1988), in which the Supreme Court held that "[s]cienter is not an element of a violation of § 455(a)," id. at 859, which requires disqualification "in any proceeding in which [the judge's] impartiality might reasonably be questioned," 28 U.S.C. § 455(a). Rather, the Court held, "advancement of the purpose of the provision -- to promote public confidence in the integrity of the judicial process -- does not depend upon whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew." 486 U.S. at 859-60 (citations omitted).
 
 
 [5]
 Section 455(b) states:
 He shall also disqualify himself in the following circumstances:
 (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
 (2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;
 (3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;
 (4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
 (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
 (i) Is a party to the proceeding, or an officer, director, or trustee of a party;
 (ii) Is acting as a lawyer in the proceeding;
 (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
 (iv) Is to the judge's knowledge likely to be a material witness in the proceeding.
 No claim is made that any of the circumstances catalogued in Subsection (b) are present in this matter.
 
 
 [6]
 The judge did note, however, that, also while the prior appeal was pending in this court, he had attended an expense-paid seminar sponsored by the Aspen Institute in Wye River, Maryland. As described by the judge, this seminar concerned "international human rights law [and] consisted of speakers who, for the most part, espoused a view of public international law broadly similar to plaintiffs' position here." See Order at 4 n.2.
 
 
 [7]
 Compare, e.g., CRC Report, at 27-49, and George Lardner, Jr., Report Links Environmental Rulings, Judges' Free Trips, Wash. Post, July 25, 2000, at A21, with Ruth Marcus, Issue Groups Fund Seminars for Judges, Wash. Post, Apr. 9, 1998, at A01 (quoting Richard G. Stearns, U.S. District Judge, District of Massachusetts, that he "never detected any attempt to indoctrinate" judges at seminars), and Letter from Richard S. Arnold, Circuit Judge, U.S. Court of Appeals for the Eighth Circuit, to John Baden, Chairman, FREE (July 31, 2000) (on file with the Administrative Office of the U.S. Courts) ("[FREE's seminar] was of the highest intellectual quality of any seminar I have attended since going on the bench almost 22 years ago. The subject matter was diverting and challenging. It may never help me decide a specific case, but it will broaden the minds of all those that heard it, and that's more important."). Cf. Congress Dumbs Down Judges, Wall St. J., Oct. 24, 2000, at A26 (quoting letter from Supreme Court Justice Ruth Bader Ginsburg to LEC after attending two seminars before serving on the Supreme Court: "For lifting the veil on such mysteries as regression analysis, and for advancing both learning and collegial relationships among federal judges, my enduring appreciation.").
 
 
 [8]
 It must also be noted that many bar organizations take formal positions on controversial issues, including issues determinative of the outcome of litigation.
 
 
 [9]
 With regard to the neutrality of government on controversial issues, a skeptic might note that one Winston S. Churchill was often banned from speaking over the British Broadcasting Corporation during the years leading to the outbreak of World War II because his views on appeasement constituted criticisms of the government. See William Manchester, The Last Lion: Winston Spencer Churchill Alone 1932-1940, at 245, 264 (1988).