Maria **AGUINDA, et al.,** Plaintiffs,

v.

**TEXACO, INC.,** Defendant.

**Gabriel Ashanga Jota, et al.,** Plaintiffs,

v.

**Texaco, Inc.,** Defendant.

**Nos. 93 CIV. 7527, 94 CIV. 9266.**

United States District Court,
S.D. New York.

May 30, 2001.

Cristobal Bonifaz, Law Offices of Cristobal Bonifaz, Amherst, MA, Martin J. D'Urso, Joseph C. Kohn, Kohn, Swift & Graf, P.C., Philadelphia, PA, for Plaintiffs.

George S. Branch, Daniel J. King, King & Spalding, Atlanta, GA, Milton Schubin, Kaye, Scholer, Fierman, Hays & Handler, LLP, Ronald Minkoff, Beldoch Levine & Hoffman LLP, Jonathan S. Abady, Emery Celli Brinckerhoff & Abady LLP, New York City, for Defendant.

### OPINION AND ORDER

RAKOFF, District Judge.

Pending before the Court is the renewed motion of defendant Texaco to dismiss these cases in favor of their being pursued in the courts of Ecuador (or in the courts of Peru by any Peruvian plaintiff who pre-

fers that forum). Because Texaco has carried its burden on every element of the motion, and because the record establishes overwhelmingly that these cases have everything to do with Ecuador and nothing to do with the United States, the Court grants the motion and dismisses the cases on the ground of *forum non conveniens.*

Familiarity with the facts and prior proceedings in these cases is here assumed. *See, e.g., Aquinda v. Texaco, Inc.,* 945 F.Supp. 625 (S.D.N.Y.1996), *reconsid. denied,* 175 F.R.D. 50 (S.D.N.Y.1997), *vacated sub nomine, Jota v. Texaco, Inc.,* 157 F.3d 153 (2d Cir.1998). To recapitulate briefly, plaintiffs in the *Aquinda* suit are 76 residents of the Oriente region of Ecuador and plaintiffs in the *Ashanga* suit are 23 residents of the adjoining area in Peru (and four related organizations), each group of plaintiffs purporting to sue on behalf of a corresponding class of thousands of such residents. *See* Complaint, *Aguinda v. Texaco, Inc.,* 1994 WL 142006 (S.D.N.Y. April 11, 1994) ("Aguinda Compl."), at ¶¶ 3–4 & Exs. B, C, D; Complaint, *Ashanga v. Texaco, Inc.,* 94 Civ. 9266 ("Ashanga Compl."), at ¶¶ 3, 13.

Neither lawsuit alleges any injury to persons, property, or commerce in the United States. Instead, plaintiffs allege they "have or will suffer property damage, personal injuries, and increased risk of disease," Aguinda Compl. ¶ 11, in Ecuador and Peru respectively, as a result of negligent or otherwise improper oil piping and waste disposal practices that were initiated several decades ago, on lands owned by the Republic of Ecuador, by a consortium (the "Consortium") in which Texaco held an indirect interest. *See* Ashanga Compl. ¶¶ 6–7; Aguinda Compl. ¶¶ 6–7; Defendant Texaco, Inc.'s Appendix of Affidavits, Documents and Other Authorities in Support of Its Renewed Motions to Dismiss

("Texaco App."), Ex. 2, Affidavit of Texaco Petroleum Co. ("TexPet Aff."), at ¶ 7.

No present or former member of the Consortium is a party to these lawsuits. That includes the Government of Ecuador, which, either directly or through the state-owned corporation PetroEcuador, regulated the Consortium from the outset, acquired a minority stake in 1974, acquired full operational control in 1990, and acquired exclusive ownership in 1992. *See, e.g., Jota,* 157 F.3d at 156; Texaco App., Ex. 2, TexPet Aff. at ¶¶ 6–10 & Ex. B; Texaco App., Ex. 3, Deposition of William C. Benton ("Benton Dep.") at 201. Not only is the Government of Ecuador not named as a party but also it cannot be sued as a third-party defendant, since it has now formally affirmed that it will not waive sovereign immunity with respect to these cases, *see infra.*

Even before the Government of Ecuador took complete control of the Consortium, Texaco's only interest consisted of its indirect investment in Texaco Petroleum Company ("TexPet"), a Delaware corporation and fourth-tier subsidiary of Texaco, which initially operated the petroleum concession for the Consortium and held varying interests in the Consortium until 1992. *See Jota,* 157 F.3d at 156; TexPet Aff. at ¶¶ 2, 3, 10. But TexPet, though sued in the courts of Ecuador, *see infra,* is not named as a party here.

Instead, the sole defendant is Texaco, based on broad but conclusory allegations that Texaco directly controlled the Consortium's activities from the United States, *see* Aguinda Compl. at ¶¶ 2, 28; Ashanga Compl. at ¶¶ 11, 25. Faced with similar allegations in a parallel action brought against Texaco by some of the same plaintiffs as here, the United States District Court for the Southern District of Texas dismissed the case in favor of its being pursued in the courts of Ecuador. *See*

*Sequihua v. Texaco, Inc.*, 847 F.Supp. 61, 63 (S.D.Tex.1994). Here, however, the late Judge Broderick (to whom these cases were originally assigned)—while expressing doubts that these suits would survive a similar motion to dismiss, *see Aguinda v. Texaco, Inc.*, 1994 WL 142006, at *2 (S.D.N.Y. Apr. 11, 1994)—allowed plaintiffs to conduct considerable discovery as to the alleged Texaco involvement.

Nonetheless, the plaintiffs, after taking numerous depositions and obtaining responses to no fewer than 81 document requests and 143 interrogatories, were unable to adduce material competent evidence of meaningful Texaco involvement in the misconduct complained of—to the point that plaintiffs essentially stipulated as much. *See* Texaco App., Ex. 21, Stipulation and Order, *Aguinda v. Texaco Inc.*, 93 Civ. 7527, dated July 12, 1995. Accordingly, this judge (to whom the cases were ultimately reassigned following Judge Broderick's death) dismissed the cases on the ground, *inter alia*, of *forum non conveniens*. *See Aquinda v. Texaco, Inc.*, 945 F.Supp. 625 (S.D.N.Y.1996), *reconsid. denied*, 175 F.R.D. 50 (S.D.N.Y.1997); *Ashanga v. Texaco, Inc.*, 94 Civ. 9266 (judgment, Aug. 13, 1997). The Court of Appeals reversed, however, finding, so far as *forum non conveniens* was concerned, that the district court had failed to obtain "a commitment by Texaco to submit to the jurisdiction of the Ecuadoran courts for purposes of this action" and, further, had relied too heavily on the determinations of the District Court for the Southern District of Texas in weighing the factors relevant to a *forum non conveniens* dismissal. *Jota*, 157 F.3d at 159.

Following remand, Texaco provided the missing commitment to submit to the jurisdiction of the courts of Ecuador (and Peru, as well) and then renewed its motion to dismiss on ground of *forum non conve-* *niens*. After receiving further briefing from the parties and obtaining clarification from the Government of Ecuador as to its current posture respecting these lawsuits, *cf. Jota*, 157 F.3d at 160, this Court, by Order dated January 21, 2000, indicated that it was leaning toward granting the motion but would defer ruling in order to give the plaintiffs the chance to reopen an issue they had previously abandoned, *i.e.*, whether the courts of Ecuador (and/or Peru) are sufficiently independent and impartial to provide the requisite modicum of due process. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141–42 & n. 1 (2d Cir.2000).

After briefing on this issue was completed, the matter was further delayed by plaintiffs' mandamus petition to the Court of Appeals seeking this Court's recusal. That petition having now been denied, *see In re Aguinda*, 241 F.3d 194, 2000 WL 33182244 (2d Cir. Feb. 23, 2001), and plaintiffs' further petition for rehearing *en banc* of that denial having also been denied by order of the Court of Appeals filed May 29, 2001, the Court is now free to rule on the pending motion.

■ To prevail on a motion to dismiss on the ground of *forum non conveniens*, a defendant must demonstrate (1) that there exists an adequate alternative forum, *see DiRienzo v. Philip Servs. Corp.*, 232 F.3d 49, 56 (2d Cir.2000); *Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V.*, 145 F.3d 505, 510 (2d Cir.1998); *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir.1998), and (2) that the ordinarily strong presumption favoring the plaintiff's chosen forum is overcome by a balance of the relevant factors of private and public interest weighing heavily in favor of the alternative forum, *see Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–57, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), *reh'g denied*, 455 U.S. 928, 102 S.Ct. 1296,

71 L.Ed.2d 474 (1982); *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–10, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) (*"Gilbert"*); *DiRienzo*, 232 F.3d at 56–57; *PT United Can Co.*, 138 F.3d at 73–74.

■ The requirement of an adequate alternative forum "[o]rdinarily ... will be satisfied when the defendant is 'amenable to process' in the other jurisdiction." *Piper Aircraft*, 454 U.S. at 255 n. 22, 102 S.Ct. 252 (quoting *Gilbert*, 330 U.S. at 506–07, 67 S.Ct. 839); *see also Blanco v. Banco Industrial de Venezuela, S.A.*, 997 F.2d 974, 980 (2d Cir.1993). Furthermore, "[a]n agreement by the defendant to submit to the jurisdiction of the foreign forum can generally satisfy this requirement." *DiRienzo*, 232 F.3d at 57; *see also Jota*, 157 F.3d at 159. Here, Texaco has now unambiguously agreed in writing to being sued on these claims (or their Ecuadorian equivalents) in Ecuador, to accept service of process in Ecuador, and to waive for 60 days after the date of this dismissal any statute of limitations-based defenses that may have matured since the filing of the instant Complaints. *See* Texaco Inc.'s Memorandum of Law In Support of Its Renewed Motions to Dismiss Based on Forum Non Conveniens and International Comity ("Def.'s Mem.") at 12–13; Texaco App., Exs. 18 & 19, Texaco Inc.'s Notice of Agreements in Satisfying Forum Non Conveniens and International Comity Conditions; transcript of hearing on defendant's renewed motion to dismiss, Feb. 1, 1999 ("Tr.") at 5. Though not required to do so by the Court of Appeals, Texaco has also provided identical assurances with respect to a Peruvian forum, should any of the Peruvian residents in *Ashanga* prefer that forum. *See* Def.'s Mem. at 12–13; Texaco App., Ex. 19.

While plaintiffs argue that these commitments by Texaco do not extend beyond the named plaintiffs to other, unnamed members of the putative classes, this is not a reasonable reading of the commitments and the Court does not so construe them. Lest there be any doubt, however, the Court directs that if Texaco does not agree that these commitments extend, *mutatis mutandis,* to all members of the putative classes, it must so inform the Court in writing within three business days of receiving this Opinion and Order, in which case the Court will re-open the otherwise final dismissal ·of these cases.

Even though, as mentioned, such submission by a defendant to being sued in a foreign forum is normally sufficient in itself to satisfy the threshold requirement of an adequate alternative forum in a motion to dismiss on grounds of *forum non conveniens,* plaintiffs, in their opposition to defendant's instant motion, raise several additional objections to the adequacy of an Ecuadorian forum. The first is that "Ecuador Is Not An Adequate Forum Because Its Jurisprudence, For All Practical Purposes, Does Not Recognize Tort Claims." Memorandum in Support of Plaintiffs' Reply to Defendant's Motion to Dismiss the Complaint, dated Jan. 25, 1999 ("Pls.' Jan. 25, 1999 Mem.") at 5. Rather remarkably, this argument ignores the undisputed evidence that certain members of the putative *Aguinda* class, as well as three affected Ecuadorian municipalities, have already brought tort actions in the Ecuadorian courts, on some of the very claims here alleged, against TexPet, Petroecuador and other present or former members of the Consortium, and have, in some of these cases, obtained tort judgments in plaintiffs' favor. *See* Texaco App., Ex. 14, Affidavit of Dr. Vicente Bermeo Lañas at ¶ 13; Texaco App., Ex. 15, Affidavit of Dr. Rodrigo Perez Pallares ("Perez Aff.") at ¶ 4 & Ex. A; *see also* Texaco App., Ex. 13, Affidavit of Dr. Adolfo Callejas Ribadeneira, dated Dec. 28, 1998 ("Callejas Aff. I") at ¶¶ 2–5

& Exs. A—D; Texaco, Inc.'s Reply Memorandum of Law in Support of Its Renewed Motions to Dismiss Based on Forum Non Conveniens and International Comity ("Def.'s Reply Mem."), Ex. 1, Affidavit of Dr. Adolfo Callejas Ribadeneira, dated Jan. 22, 1999 ("Callejas Aff. II") at ¶¶ 3–4 & Ex. A. Likewise, although unrelated to the particular claims here made, numerous Ecuadorian oilfield workers have brought personal injury suits against TexPet in Ecuador based on claims of alleged negligence and have prevailed in several of these cases. *See* Perez Aff., Exs. A, B.

More generally, section 2241 of the Ecuadorian Civil Code expressly provides that persons injured in their person or property by another's negligence or intentional wrongdoing may sue in the Ecuadorian courts for monetary damages and equitable relief. *See* Texaco App., Ex. 10, Affidavit of Dr. Enrique Ponce y Carbo ("Ponce y Carbo Aff.") at ¶¶ 12–14; *see also Delgado v. Shell Oil Co.*, 890 F.Supp. 1324, 1359–60 (S.D.Tex.1995), *aff'd*, 231 F.3d 165 (5th Cir.2000). Plaintiffs concede as much, but nevertheless assert, through their "legal expert," that "very few such actions are filed in the [Ecuadorian] courts." *See* Plaintiffs' Appendix of Affidavits, Documents and Other Authorities in Opposition of [*sic*] Texaco's Motions to Dismiss, Ex. 79, Affidavit of Alberto Wray ("Wray Aff.") at ¶ 8. Professor Wray, however, supplies little explanation or description of his methodology in reaching this conclusion, and it appears to be based on nothing more than a tenuous inference from the fact that in Ecuador (as in the United States) few tort cases reach the nation's Supreme Court. Comparable inferences have been held insufficient to deem a foreign forum inadequate. *See In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December, 1984*, 634 F.Supp. 842, 848–52 (S.D.N.Y.1986) (Indian forum found adequate for mass tort case despite assertions of "little reported case law in the tort field," "no tort law relating to disputes arising out of complex product or design liability," and other indications of lesser-developed tort law), *aff'd as modified*, 809 F.2d 195 (2d Cir. 1987); *see also Alnwick v. European Micro Holdings, Inc.*, 2001 WL 391952, at *6 (E.D.N.Y. Mar. 22, 2001) (Dutch forum adequate "even assuming that Dutch law does not recognize the tort of fraud"); and *cf. Capital Currency Exch., N.V. v. National Westminster Bank PLC*, 155 F.3d 603, 609–11 (2d Cir.1998) (England adequate forum despite fact that English courts had never awarded money damages in antitrust case).

Here, moreover, any speculation about the Ecuadorian courts' alleged unreceptiveness to tort cases is put to rest by the undisputed evidence, *supra*, that tort claims based on the very occurrences here at issue have been successfully prosecuted in the Ecuadorian courts. Furthermore, several United States courts have previously found Ecuador to be an adequate forum to address similar (and, in some cases, identical) tort claims to those of plaintiffs here. *See, e.g., Delgado*, 890 F.Supp. at 1359–61 (Ecuador adequate for personal injury cases based on pesticide exposure); *Sequihua*, 847 F.Supp. at 64 (Ecuador adequate to address personal injury and property damage from oil pollution); *Ciba–Geigy Ltd. v. Fish Peddler, Inc.*, 691 So.2d 1111, 1117 (Fla.Dist.Ct. App.1997) (Ecuador adequate to address property damage from fungicide exposure). In short, plaintiffs' first objection to the adequacy of an Ecuadorian forum is entirely without foundation.

■ Plaintiffs' second objection to the adequacy of an Ecuadorian forum is that "Ecuador is Not an Adequate Forum For This Litigation Because Ecuador Does Not

Recognize Class Actions and Has No Comparable Procedure to Grant Plaintiffs the Equitable Remedy They Are Principally Seeking." Pls.' Mem. at 10. This, again, is unpersuasive. The class action mechanism, added to the Federal Rules of Civil Procedure in 1937, is ultimately nothing more than a "convenient procedural device," *Beamon v. Brown*, 125 F.3d 965, 969 (6th Cir.1997) (quoting 3B James Wm. Moore, *et al.*, *Moore's Federal Practice* ¶ 23.02 (2d ed.1980)), which most of the world's nations have chosen not to adopt and the merits of which continue to be debated even in the United States. Its absence does not ordinarily render a foreign forum "inadequate" for purposes of *forum non conveniens* analysis. *See, e.g., Beamon*, 125 F.3d at 969–70; *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December, 1984*, 809 F.2d 195, 199 (2d Cir.1987); *In re Lloyd's Am. Trust Fund Litig.*, 954 F.Supp. 656, 673 (S.D.N.Y.1997); *and cf., e.g., Murray v. British Broadcasting Corp.*, 81 F.3d 287, 292–93 (2d Cir.1996) (England adequate forum despite plaintiff's claim that American contingency fee was only way he could afford a lawyer).

It seems doubtful, moreover, that the instant cases would qualify for class action status even if they were to remain in the United States, *see generally Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and hence the alleged deprivation of this device may be no deprivation at all. To begin with, there are immense due process problems inherent in providing adequate notice and representation to the thousands of Amazonian residents that plaintiffs seek to include in their proposed classes, *see generally, Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 843–48, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412 (5th Cir.1998). It is also obvious that the multiplicity of ways in which plaintiffs allege that the Consortium's activities have directly and indirectly impacted various plaintiffs' various interests, or will impact them in the future, renders it problematic whether questions of law or fact common to the members of the class predominate over questions affecting individual members. *See, e.g., Amchem*, 521 U.S. at 623–25, 117 S.Ct. 2231; *see also Aguinda*, 1994 WL at *2.

Even the bare question of liability could not readily be handled here as a class action, given the multiple causation issues raised by plaintiffs' claims of indirect injuries extending over hundreds of miles and dozens of years and affecting individual members of the classes (including future claimants) in a multitude of different ways, ranging from the pollution of wells to the development of "pre-cancerous growths." *See Jota*, 157 F.3d at 155–56. Indeed, many of the injuries claimed by even the named plaintiffs are in the nature of "increased risks" and other future contingent claims that have not yet ripened into actual injuries. *See, e.g.,* Aguinda Compl. ¶¶ 11–26; Ashanga Compl. ¶¶ 13–23. While conceivably some of these problems might be mitigated through the creation and adequate representation of numerous subclasses (none of which plaintiffs provide for), it is difficult to see how the vastly complicated, if not entirely unmanageable lawsuit that would then emerge would offer greater efficiencies than could be achieved in Ecuador through more conventional lawsuits invoking traditional principles of stare decisis and joinder. Indeed, even where class actions are permitted, as in the United States, experience has shown that the premature and undifferentiated aggregation of hundreds or thousands of tort claims has often proved counterproductive. *See Report on Mass Tort Litigation To the Judicial Conference of the*

*United States* (*"Judicial Conference Report"*) 5–6, 22; 36, 39–40 (1999).

While plaintiffs try to skirt some of these objections by claiming in conclusory fashion that they are "principally" seeking equitable, injunctive relief, *see* Pls.' Mem. at 10, they have in no respect relinquished their claims for billions of dollars in damages and other legal relief, *see Jota,* 157 F.3d at 161. Without such relinquishment, it is highly doubtful that the equitable aspects of these cases could be separately litigated in a way that would satisfy Rule 23, Fed.R.Civ.P. *See Allison,* 151 F.3d at 425–26. Indeed, much of the equitable relief here sought (such as "medical monitoring" for a variety of potential future medical injuries) is inextricably intertwined with the individualized claims for damages and the individualized issues of multiple causation.

Even assuming *arguendo* that plaintiffs' claims for equitable relief could be separated from the rest of the litigation, it is equally doubtful, as the Court of Appeals recognized, *see Jota,* 157 F.3d at 162, that a United States court could, in the absence of the Government of Ecuador, fully address many of plaintiffs' claims for equitable relief; and that Government has now ·made clear that it will neither waive sovereign immunity nor participate as a party in these actions here, *see* Texaco App., Ex. 17, Letter to the Court from Ambassador of Ecuador; *see also* Tr. at 59. Since, by contrast, the Government of Ecuador can be joined as a party in Ecuador, an Ecuadorian forum, even in the absence of the class action device, might well be a more adequate forum than the United States for purposes of providing complete equitable relief. In short, the absence of the class action device in Ecuador is not a sufficient impediment to render the Ecuadorian forum inadequate.

Plaintiffs' final objection to the adequacy of an Ecuadorian forum is that "Procedural Processes in Ecuador Make It Difficult if Not Impossible to Litigate These Tort Actions There." Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Complaint, Jan. 11, 1999 ("Pls.' Jan. 11, 1999 Mem.") at 9; *see also id.* at 13–14. Under this heading, plaintiffs first argue that claims of environmental contamination commenced in Ecuador must initially be filed with administrative agencies and that these agencies are slow to take action. *See id.* at 9. Plaintiffs' only support for these assertions is a typically conclusory opinion from Professor Wray, who cites no authority to justify his conclusions in this regard. *See* Wray Aff. ¶ 12. Defendant, by contrast, has adduced detailed affidavits from its Ecuadorian legal experts specifically denying that any such impediment exists to filing these claims directly with the Ecuadorian courts and asserting, instead, that the administrative agencies simply provide an alternative forum for certain of plaintiffs' claims. *See* Ponce y Carbo Aff. at ¶ 17; Callejas Aff. I at ¶ 5; Callejas Aff. II at ¶¶ 3–5. Moreover, even if Professor Wray were right and plaintiffs had to first pursue their administrative remedies, such an "exhaustion" requirement, commonplace to much United States litigation, is hardly a ground for deeming the Ecuadorian forum inadequate. *See generally DiRienzo,* 232 F.3d at 57 ("Even if particular causes of action or certain desirable remedies are not available in the foreign forum, that forum will usually be adequate so long as it permits litigation of the subject matter of the dispute, provides adequate procedural safeguards and the remedy available in the alternative forum is not so inadequate as to amount to no remedy at all.").

Plaintiffs' other argument under their third heading essentially consists of listing some of the differences between United

States procedures and those of civil law systems like Ecuador's that make the former a more favorable forum for plaintiffs generally. Such differences include, for example, Ecuador's tighter restrictions on discovery, its denial of oral cross-examination in certain circumstances, and its preference for court-appointed experts over party-retained experts. *See* Wray Aff. ¶¶ 4–7. Some would argue that these features of civil law systems render those systems more, not less, adequate to the fair determination of justice; and certainly in recent years the United States has itself moved in the direction of imposing more limits on discovery and giving courts more control over expert testimony. But whatever the merits of these debates, the notion that any of these differences renders "inadequate" in any fundamental sense the civil law system employed by Ecuador, by most other nations in South America, and by most of the nations of Europe is insulting to those nations and absurd on its face.[1] *See generally DiRienzo*, 232 F.3d at 57–59; *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 768 (9th Cir.1991); *Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 829 (2d Cir.1990); *Potomac Capital Inv. Corp. v. Koninklijke Luchtvaapt Maatschapplj N.V.*, 1998 WL 92416, at *5 (S.D.N.Y. Mar. 4, 1998); *Manela v. Garantia Banking Ltd.*, 940 F.Supp. 584, 590–91 & n. 11 (S.D.N.Y. 1996); *Polanco v. H.B. Fuller Co.*, 941 F.Supp. 1512, 1527 (D.Minn.1996).

Further still, the asserted procedural difference between the United States and Ecuadorian legal systems of which plaintiffs most complain, *i.e.*, the supposed inability of an Ecuadorian court to compel discovery from Texaco even if Texaco submits to the court's jurisdiction, *see* Pls.' Jan. 11, 1999 Mem. at 13, not only is challenged by Texaco's legal expert as an inaccurate assertion, *see* Ponce y Carbo Aff. at ¶ 18, but also is, in any event, rendered largely irrelevant by the fact that Texaco has expressly stipulated that the very substantial discovery plaintiffs have already obtained from Texaco in these cases, *see Aguinda v. Texaco, Inc.*, 1994 WL 142006, at *1 (S.D.N.Y. Apr. 11, 1994), can be utilized in the Ecuador courts by any plaintiff bringing suit there, *see* Def.'s Mem. at 13.

In sum, none of the objections to the adequacy of an Ecuadorian forum that plaintiffs have specifically raised in response to the instant motion has merit.

■ Earlier in this litigation, plaintiffs also appeared to raise, and then abandon, the further objection that the Ecuadorian courts were subject to corrupting influences and outside pressures, especially from the military, that rendered them inadequate to dispense independent, impartial justice in these cases. *Compare, e.g.*, Plaintiffs' Memorandum in Opposition to Texaco, Inc.'s Motions to Dismiss, dated Feb. 20, 1996 ("Pls.' 1996 Mem.") at 40 n. 72 ("Even since the military junta relinquished power in 1979, corruption has tainted the Ecuadorian judiciary.") *with id.* at 42 ("Plaintiffs do not rely on any such assumption [that Ecuadorian courts are unable to dispense justice]."). When the instant motion was renewed on remand from the Court of Appeals, plaintiffs, in their memoranda in opposition, made no mention of this issue whatever.

---

1. Following remand from the Court of Appeals, the Government of Ecuador expressly confirmed to this Court, at a hearing attended not only by its counsel but also by its Procurador General and its United Nations Ambassador, that it believed that, while its legal procedures were different from those of the United States, it nonetheless could provide an adequate forum for this litigation. *See* Tr. at 63.

Nevertheless, in late January 2000, after members of the Ecuadorian military joined protestors (including indigenous dissidents) in what ultimately proved to be an abortive coup, this Court, *sua sponte*, invited renewed consideration of this issue, *see* Memorandum Order dated Jan. 31, 2000. In response, submissions were eventually received not only from the parties but also from the U.S. Department of State and the Government of Ecuador. Unfortunately, most of these papers proved of little use to the Court, since they largely consisted (perhaps understandably) of broad, conclusory assertions as to the relative corruptibility or incorruptibility of the Ecuadorian courts, with scant reference to specifics, evidence, or application to the instant cases. As Judge Broderick pointed out early in this litigation, "the courts of the United States are properly reluctant to assume that the courts of a sister democracy are unable to dispense justice," *Aguinda v. Texaco, Inc.*, 1994 WL 142006 at *2, and something more than bald assertion is required to overcome this presumption. *See, e.g., El–Fadl v. Central Bank of Jordan*, 75 F.3d 668, 678 (D.C.Cir. 1996); *Blanco*, 997 F.2d at 982; *Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1351 (1st Cir.1992).

When one looks beyond gross generalizations to relevant particulars, one finds the following:

(1) There is not the slightest indication, in any of the papers submitted on this issue, of any impropriety on the part of Texaco or any of its affiliates, or indeed on the part of any present or former member of the Consortium, with respect to any judicial or administrative proceeding of any kind in Ecuador. Indeed, as previously mentioned, TexPet and PetroEcuador have already been sued in Ecuador on some of the same or related claims by some of the same or related plaintiffs as are involved here, and several of these suits have resulted in judgments involving substantial payments to certain of the plaintiffs. *See* Callejas Aff. I at ¶¶ 2–5 & Exs. A–K; Texaco, Inc.'s Appendix of Rebuttal Exhibits in Support of Its Reply Memorandum of Law ("Texaco Rebuttal App."), Ex. 22, Affidavit of Dr. Ricardo Vaca Andrade ("Vaca Aff."), at ¶ 1.

(2) There are presently pending in Ecuador's courts numerous cases against multinational corporations. *See* Callejas Aff. I at ¶ 5; Texaco Rebuttal App., Ex. 25, Supplemental Aff. of Dr. Alejandro Ponce Martinez, at ¶ 2. None of the submissions here alleges corruption of the judiciary or the judicial process on the part of any of these corporations. On the contrary, the Chairman of Ecuador's judicial disciplinary committee, who while in private practice successfully litigated numerous cases against TexPet, affirms that Ecuadorian courts do not give preferential treatment to multi-national companies like Texaco. *See* Vaca Aff. at ¶¶ 1,6.

(3) The failure of the military coup of January 21, 2000 reaffirmed Ecuador's insistence on democratic, civilian control of its institutions. While no one claims the Ecuadorian judiciary is wholly immune to corruption, inefficiency, or outside pressure, the present Government of Ecuador, headed by a former law school dean, has taken vigorous steps to further the independence and impartiality of the judiciary, *see* Texaco Rebuttal App., Ex. 34, Declaration of Dr. Ramon Jiménez–Carbo, Ecuador's Attorney General, dated Apr. 5, 2000. As summarized by the U.S. Department of State in its most recent Human Rights "Country Report" on Ecuador, dated February, 2000 ("2000 Country Report"), *available at* http://www.state.gov, at 5:

> The Supreme Court that took office in 1997 publicly recognized the shortcomings of the judicial system and pledged

to improve the quality and training of judges. In May 1998, the Supreme Court supervised the selection by open competition of all appellate judges. A Judicial Council, charged with administering the court system and disciplining judges, took office in the fall of 1998. In November 1999, the Council's disciplinary committee fired two judges and two court employees for their role in the release of suspected drug traffickers. All four faced criminal charges. During the year, the Judicial Council removed at least two judges and a number of minor officials from their jobs.

*See also* Letter to A.U.S.A. Edward Scarvalone from U.S. Dept. of State, dated June 8, 2000, Ex. A (1999 Country Report for Ecuador) at 6 (to same effect); *Bridgeway Corp.*, 201 F.3d at 142–43 (2000) (status of Country Reports).

(4) While the State Department nonetheless continues to describe Ecuador's legal and judicial systems as "politicized, inefficient, and sometimes corrupt" so far as certain "human rights" practices are concerned, *see* 2000 Country Report at 1, this is based, as the Country Reports make clear, on cases largely involving confrontations between the police and political protestors. *Id.* By contrast, *not one* of the cases described by the 1999 and 2000 Country Reports as evidence of such conclusions remotely resembles the kind of controversy here at issue. *See* 1999 and 2000 Country Reports; *see also Diaz v. Aerovias Nacionales De Colombia*, 1991 WL 35855, at \*1 (S.D.N.Y. Mar. 12, 1991), *aff'd*, 948 F.2d 1276 (2d Cir.1991).

(5) As previously noted, in the past decade alone numerous United States courts have found Ecuador to be an adequate alternative forum for the determination of civil disputes involving United States companies, *see, e.g., Patrickson v. Dole Food Co.*, Civil No. 97–01516 (D.Haw.1998) (slip op. at 41–51), *available at* Texaco App., Ex. 25; *Espinola–E v. Coahoma Chem. Co.*, Civil No. 96cv360RR (S.D.Miss.1998) (slip op. at 5–9), *available at* Texaco App., Ex. 26; *Delgado*, 890 F.Supp. at 1359–60; *Sequihua*, 847 F.Supp. at 64; *Ciba–Geigy Ltd.*, 691 So.2d at 1117. Nor has any case held to the contrary since Ecuador became a democratic constitutional republic in 1979.

(6) Finally, the underlying claims here in issue have been and continue to be the subject of public scrutiny and political debate in Ecuador, a fact made prominent even by the Government of Ecuador's own statements to this Court, *see, e.g.*, Plaintiffs' Supplemental Submission In Further Response To This Court's January 31, 2000 Memorandum Order And This Court's May 2, 2000 Conference, Ex. 46, Letter from Ecuador's Attorney General to Nina Pacari Vega, Second Vice–President of the Ecuadorian National Congress, dated Apr. 26, 2000.[2] Given such public scrutiny in Ecuador, even the possibility that corruption or undue influence might be brought to bear if this litigation were pursued in Ecuador seems exceedingly remote. *See* Texaco Rebuttal App., Ex. 23, Affidavit of Dr. Fabian Corral Burbano de Lara at ¶ 9.

Accordingly, the Court is satisfied on the basis of the record before it that the courts of Ecuador can exercise with respect to the parties and claims here presented that modicum of independence and

---

**2.** Pacari is the leader of Pachakutik, an Ecuadorian political party of substantial and increasing power having its primary support among indigenous groups in the Amazon and Sierra regions of Ecuador. *See* U.S. Dept. of State, FY 2001 Country Commercial Guide: Ecuador ("2001 Ecuador Commercial Guide") at 18, *available at* http://www.state.gov.

impartiality necessary to an adequate alternative forum. *See Bridgeway Corp.*, 201 F.3d at 141–42 & n. 1. While the Court has been presented with less information on which to assess the adequacy of the Peruvian courts in this respect, *but see Torres v. Southern Peru Copper Corp.*, 965 F.Supp. 899, 903 (S.D.Tex.1996), *aff'd*, 113 F.3d 540 (5th Cir.1997) (finding Peru to be an adequate alternative forum); *Vargas v. M/V Mini Lama*, 709 F.Supp. 117, 118 (E.D.La.1989) (same), the Ecuadorian courts provide in any event an adequate forum in which the Peruvian plaintiffs here can bring their claims. *See* Callejas Aff. I at ¶¶ 11–13; Ponce y Carbo Aff. at ¶¶ 9, 11, 14.[3] The Peruvian forum, therefore, is simply an alternative option that the Peruvian plaintiffs may, if they wish, elect.

While Ecuador therefore provides an adequate alternative forum for these cases, the United States, by contrast, is a palpably inadequate forum for these cases in some notable respects. As Judge Broderick stated in indicating, at the very outset of this litigation, his preliminary belief that dismissal on *forum non conveniens* grounds might well be appropriate: "[d]isputes over class membership, determination of individualized or common damages, and the need for large amounts of testimony with interpreters, perhaps often in local dialects, would make effective adjudication in New York problematic at best." *Aguinda*, 1994 WL 142006 at *2, quoted also in *Jota*, 157 F.3d at 156–57. Similarly, in its Memorandum Order of January 31, 2000, this Court noted that "the notion that a New York jury (which plaintiffs have demanded) applying Ecuadorian law (which likely governs the claims here made) could meaningfully assess what occurred in the Amazonian rainforests of Ecuador in the late 1960's and early 1970's is problematic on its face." *Aguinda*, 2000 WL 122143, at *1. A court, no matter how steeped in due process, whose fact-finders are called upon to adjudicate matters so extremely far removed from their everyday experience may not itself provide an adequate forum.

■ Although not strictly an issue of "adequacy," mention should also be made under this rubric of the fact that in early 1998 Ecuador, apparently in reaction to the fact that certain disputes between Ecuadorian shrimp farmers and an American pesticide manufacturer were the subject of parallel litigation in both the Ecuadorian courts and the state courts of Florida, *see* Tr. at 17–18, passed Interpretive Law 55, which reads in pertinent part as follows:

> Without prejudice to the meaning of its literal tone let articles 27, 28, 29 and 30 of the Code of Civil Procedure be interpreted in the sense that when dealing with concurrent international competency, the claimant will be able to choose freely between filing the lawsuit in Ecuador or abroad ... Should the lawsuit be filed outside Ecuadorian territory, this will definitely terminate national competency as well as any jurisdiction of Ecuadorian judges over the matter.

Exhibits In Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss the Complaint, Ex. 1.

Plaintiffs argue that, under Law 55, their filing of these suits in the United States has deprived the Ecuadorian courts of jurisdiction. This argument, however, rests on two doubtful assumptions. The first is that Law 55 is retroactive and applies to lawsuits, like these, that were filed prior to the enactment of Law 55 in 1998. This seems dubious on its face,

---

**3.** While plaintiffs claim the Ecuadorian courts are biased against Peruvians, they adduce no competent evidence of this allegation but simply make reference to the border dispute between the two countries that was settled in 1998.

since it posits that such plaintiffs would be conclusively held to a choice of forum made before they had any reason to believe either that such a choice would be conclusive or that it would forever deprive them of even the possibility of an alternative forum. The second assumption is that Law 55 applies even after a case is dismissed on grounds like *forum non conveniens*. This also seems highly doubtful, since the ostensible purpose of the law is to require plaintiffs to proceed in a single forum, not to be deprived of any forum whatever (let alone the forum found most relevant). *See* Ponce y Carbo Aff. at ¶ 32.

While the Ecuadorian courts have yet to resolve these issues, *see* Tr. at 59–61; *see also* Callejas Aff. II at ¶¶ 6–11 & Ex. B, and while the Government of Ecuador has taken no position as to applicability *vel non* of Law 55 to the instant case, *see* Tr. at 59–61, the unlikelihood that Ecuadorian courts would ultimately adopt both these dubious assumptions makes Law 55 an insufficient basis for concluding that the Ecuadorian forum is unavailable. *See Patrickson v. Dole Food Co.*, slip op. at 43–44. Nevertheless, as a safeguard, this Court, like the Court in *Patrickson, supra,* will qualify the dismissals here to provide that in the event that a court of last review in Ecuador finally affirms the dismissal for lack of jurisdiction pursuant to Law 55 of any action raising the claims here at issue pursued in good faith in Ecuador by any of the plaintiffs here, this Court, upon motion made within 60 days, will resume jurisdiction over that action.

■ Having carried its burden of proving that an adequate alternative forum exists, defendant must next "demonstrate that the ordinarily strong presumption favoring the plaintiff's chosen forum is countered by the private and public interest factors set out in *Gilbert,* which weigh so heavily in favor of the foreign forum that they overcome the presumption for plaintiffs' choice of forum." *DiRienzo,* 232 F.3d at 56–57. *See also, e.g., Piper Aircraft,* 454 U.S. at 255–56, 102 S.Ct. 252; *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839. It is true that in certain circumstances "a foreign plaintiff's choice deserves less deference," *Piper Aircraft,* 454 U.S. at 256, 102 S.Ct. 252, notably where, as here, the plaintiffs involved are all foreign nationals residing abroad. *See, e.g., Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 103 (2d Cir.2000); *In re Union Carbide,* 809 F.2d at 198. But the Second Circuit has also chosen not to apply this lesser deference "when a treaty with a foreign nation accords its nationals access to our courts equivalent to that provided American citizens." *Blanco,* 997 F.2d at 981. Since it appears that the United States has such a treaty with Ecuador, *see* Treaty with Ecuador, June 13, 1839, art. 13, 8 Stat. 534, 538, this Court will assume *arguendo* that plaintiffs' choice of forum carries a strong presumption of validity that may only be overcome by a balance of relevant factors that heavily favors dismissal in favor of an alternative forum. *See, e.g., Evolution Online Sys.,* 145 F.3d at 510.

In weighing this balance, the Court must consider the "private interest" and "public interest" factors set out in *Gilbert,* as well as other relevant factors special to the case. *See Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839. In so doing, a prudent district court should proceed with caution, since the assigning of relative weights in such circumstances often calls for a nice exercise of discretion. The fact that, because of the district court's greater familiarity with the full "feel" and "flavor" of the case, such exercise of discretion is subject to limited appellate review, *see, e.g., Alfadda v. Fenn,* 159 F.3d 41, 45 (2d Cir.1998), is only the more reason for the district court to proceed with care and circumspection.

But having done its level best to proceed in this manner, this Court is of the view that the balance of both private and public interest factors tips here overwhelmingly in favor of dismissal of these cases.

Under *Gilbert,* the "private interest" factors include the relative ease of access to sources of proof, the cost of obtaining the attendance of willing witnesses, the availability of compulsory process for obtaining attendance of unwilling witnesses, the possibility of viewing the relevant premises, and other such practical concerns. *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839. Here, these factors weigh heavily in favor of an Ecuadorian forum. On plaintiffs' own submissions, these cases concern the ongoing contamination of the rain forest of eastern Ecuador and adjoining areas as a result of allegedly negligent oil piping and waste disposal practices undertaken there. An Ecuadorian court would be able to view those premises and assess the allegations made in respect to them in ways no New York jury could hope to approximate. Likewise, all plaintiffs, as well as all members of their putative classes, reside in eastern Ecuador or nearby areas of Peru, all of their alleged personal and property injuries occurred there, and virtually all witnesses to the manner in which such injuries occurred reside there, along with all the relevant medical and property records. *See* Texaco App., Ex. 1, Affidavit of Daniel J. King ("King Aff.") at ¶¶ 24–29; Ashanga Compl. at ¶¶ 41–48, 64; Aguinda Compl. at ¶¶ 3, 11. Further still, defendant has made an essentially unrebutted showing that both the documentary and testamentary evidence of the allegedly negligent acts and decisions taken by the Consortium resides in Ecuador, *see* King Aff. at ¶ 26, along with the primary evidence supporting defendant's defenses including evidence bearing on the key roles of Petroecuador and the Government of Ecuador, *see id.* at ¶¶ 22, 24–26, 28.

By contrast, what, if anything, occurred in the United States? While plaintiffs continue to allege in conclusory fashion that Texaco directed the Consortium's oil operations from the United States, they have wholly failed, despite years of discovery, to adduce competent evidence to support this assertion. On the contrary, the record before the Court, when scrutinized in terms of admissible evidence, establishes overwhelmingly that Texaco's only meaningful involvement in the activities here complained of was its indirect investment in its fourth-tier subsidiary, TexPet, which is not a party here and which conducted its participation in the activities here complained of almost exclusively in Ecuador. *See, e.g.,* TexPet Aff. at ¶¶ 3–10.

The record before the Court also clearly establishes that all of the Consortium's key activities, including the decisions and practices here at issue, were managed, directed, and conducted by Consortium employees in Ecuador, *see, e.g.,* Texaco App., Ex. 5, Deposition of William P. Doyle ("Doyle Dep.") at 101, 104, 109; Texaco App., Ex. 6, Deposition of Robert M. Bischoff ("Bischoff Dep.") at 219; Texaco App., Ex. 8, Deposition of Robert C. Shields ("Shields Dep.") at 57, 136, 142, 184–85; Benton Dep. at 202, 206. By contrast, no one from Texaco or, indeed, anyone else operating in the United States, made any material decisions as to the Consortium's activities and practices that are at issue here, *id.; see also, e.g.,* Benton Dep. at 170–84; Texaco App., Ex 11, Deposition of Richard K. Meyers ("Meyers Dep.") at 149–51; Bischoff Aff. at 219; Texaco App., Ex. 9, Deposition of Denis York Lecorgne at 72–73.

In response, plaintiffs rely on conjecture or irrelevancy—as well as misstate-

ment and miscitation [4]—to try to supplant what their evidence wholly fails to show. For example, plaintiffs emphasize certain indications that the president of TexPet reported as a general matter to the president of Texaco's Latin American/West Africa division ("LAWA"), based in Coral Gables, Florida, and that the budgets of TexPet, along with those of many other subsidiaries, were reviewed by LAWA. *See* Pls.' 1996 Mem. at 11–14; *see also* Pls.' App., Ex. 21, Doyle Dep. at 32–33, 47–51. Plaintiffs also provide some evidence that certain unbudgeted and other contracts by TexPet were required to receive LAWA approval, largely for financial, legal, and tax purposes. *See* Pls.' 1996 Mem. at 15–17; *see also, e.g.,* Pls.' App., Ex. 20, Benton Dep. at 31–33, 48–49, 92–93. But at most this evidence simply establishes the obvious fact that Texaco, as a corporate parent, exercised some general oversight over the expenses and revenues of its subsidiaries. None of these procedures indicates any parental control or direction over the pipe design, waste disposal, and other allegedly negligent practices of the Consortium that are at issue in this case.

Plaintiffs also emphasize that the Consortium from time to time went beyond TexPet to contract with various other U.S.-based subsidiaries of Texaco (also non-parties here) for technical and other assistance, largely with regard to specific issues or in response to special requests. For example, the U.S.-based Texaco Marine Department and the Central Offshore Engineering Department provided advice, pursuant to contracts with the Consortium, regarding offshore oil installations and equipment, *see* Pls.' App., Ex. 20, Benton Dep. at 150–51, 158–60, and the Consortium also received technical assistance from the U.S.-based Texas Pipeline Company, also a subsidiary of Texaco, for certain pipeline problems, *see, e.g.,* Pls.' App., Ex. 2, Shields Dep., at 157–58. Some technical advice was even procured from Texaco's U.S.-based Environmental Health and Safety Division. *See, e.g.,* Pls.' App., Ex. 20, Benton Dep. at 159–60. However, the record is clear that all these services were limited to providing specific technical analyses requested by the Consortium to help implement design and other decisions previously reached in Ecuador, and it is the design and other decisions reached in Ecuador that are challenged in these lawsuits. Conversely, there is no evidence that any of these service contractors exercised any authority or direction, or engaged in any decision-making whatever, as to the Consortium's activities here at issue. For example, while plaintiffs allege that chemical analyses of samples used for environmental monitoring were performed in the United States, *see* Pls.' 1996 Mem. at 28 n. 57; Pls.' App., Ex. 54, Meyers Dep. at 68–71, they offer no evidence to rebut defendant's evidence that the analyses themselves were neutral and accurate and that the decisions of what actions to take on the basis of these analyses were made solely by the Consortium in Ecuador, *see, e.g.,* Texaco App., Ex. 3, Benton Dep. at 174–77; Texaco App., Ex. 5, Doyle Dep. at 155–57, 168, 251–52.

---

4. For example, even though plaintiffs state that "TexPet required the approval of Texaco personnel regarding the *merits* of *all* proposed wells in Ecuador," Pls.' 1996 Mem. at 17 (emphasis in original), the evidence they cite in support of this statement shows only that Texaco provided some funding and occasional technical assistance. *See* Pls.' App.,

Ex. 2, Shields Dep. at 77–80, 326; Pls.' App., Ex. 35. Indeed, the witness whose deposition plaintiffs cite in support of their statement actually testified to the contrary, affirming that "Texaco, Inc. had no involvement in drilling wells in Ecuador." Pls.' App., Ex. 2, Shields Dep. at 325.

In similar fashion, while plaintiffs allege in conclusory fashion that "Texaco personnel in the United States directed the response to [some] environmental problem[s] in Ecuador," the only evidence they adduce in support of this statement is an indication that some U.S.-based Texaco personnel provided technical information requested by TexPet on such topics as the maximum safe levels of salt and oil in water and how to clean up oil spills, *see* Pls.' 1996 Mem. at 29, which was then forwarded to the Consortium for its use and decision-making. Thus, far from "directing" the response, Texaco simply provided some data for a decision made in Ecuador by the Consortium. Furthermore, while plaintiffs emphasize that another Texaco subsidiary, the Texas Pipeline Company, received contractor bids for a planned expansion of the main Ecuadorian pipeline and recommended a contractor for the project, *see* Pls.' 1996 Mem. at 23–24; Pls.' App., Ex. 45, they offer no evidence that Texas Pipeline Company personnel decided the design or specifications of the proposed expansion or that such decisions caused any portion of the environmental harms that are the subject matter of this litigation. Indeed, they concede that they do not even know whether the proposed expansion was ever built in accordance with these specifications, *see* Pls.' 1996 Mem. at 23 n. 48; and, in fact (as the defendant has now shown) it was not, but rather was built in accordance with different specifications decreed by the Ecuadorian Government. *See* Texaco App., Ex. 4, Executive Decree No. 925, at § 18.2.

The simple fact of the matter is that, after having deposed numerous Texaco witnesses and reviewed tens of thousands of Texaco documents in an effort to establish a meaningful nexus between the United States and the decisions and practices here complained of, plaintiffs have come up bone dry.[5] Indeed, on July 11, 1995, after much of this discovery had been completed, plaintiffs stipulated that they had:

> no knowledge, information or documents having any tendency to prove or disprove (or otherwise lead to the discovery of information or documents that might tend to prove or disprove) the existence or non-existence of any facts relating to...
>
> (a) "events relating to the harm alleged by plaintiffs occurring in the United States, including specific or generalized directions initiating events to be implemented elsewhere, communications to and from the United States and discussions in the United States concerning, or assistance to or guidance for events occurring elsewhere; and
>
> (b) events occurring outside the United States to the extent the information can be furnished or secured voluntarily or through directives to parties in the United States to secure the information; and
>
> (c) the extent, if any, to which conduct *in the United States* caused actionable harm under the criteria discussed in [Judge Broderick's April 11, 1994 discovery Order]."

Texaco App., Ex. 21 (quoting *Aguinda*, 1994 WL 142006 at *1; Mem. Decision and Order, dated June 19, 1995, at 2–3) (emphasis in original). Nothing plaintiffs have discovered since then in any way modifies these concessions or supplies the missing nexus.

Finally, in any fair balancing here of the relevant "private interests," reference

---

5. It should also be noted that, to the extent any of this discovery taken from Texaco is even arguably relevant to any action brought in any Ecuadorian or Peruvian court by any plaintiff here, Texaco has agreed to its admissibility there. *See* Def.'s Mem. at 13; Texaco App., Exs. 18 & 19, at § B.4.

must again be made to the glaring facts that neither the Government of Ecuador nor PetroEcuador, the state-run oil company that owns the Consortium and had primary control of it through much of the relevant time period, are parties to the instant suits, whereas they could be joined in any similar suit brought in Ecuador, *see* Bermeo Aff. at ¶ 11. Indeed, Petroecuador was in fact so impleaded in one of the similar suits brought against TexPet in Ecuador. *See* Callejas Aff. I at ¶ 2.

Accordingly, the balance of the *Gilbert* "private interest" factors heavily supports dismissal of this case in favor of Ecuador (and, if any Peruvian resident prefers, Peru). *See, e.g., Stewart v. Dow Chemical Co.,* 865 F.2d 103, 107 (6th Cir.1989); *De Melo v. Lederle Labs.,* 801 F.2d 1058, 1062–63 (8th Cir.1986); *Doe v. Hyland Therapeutics Div.,* 807 F.Supp. 1117, 1125–26 (S.D.N.Y.1992); *Abouchalache v. Hilton Int'l Co.,* 464 F.Supp. 94, 97–98 (S.D.N.Y. 1978).

■ The *Gilbert* "public interest" factors include local interest in the controversy, court congestion, avoidance of unnecessary problems in application of foreign law, and avoidance of imposing jury duty on residents of a jurisdiction having little relationship to the controversy. *See Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839. Here, these factors also overwhelmingly support an Ecuadorian (and to a lesser extent Peruvian) forum in preference to one in this District or anywhere else in the United States.

The Ecuadorian local interest in the controversy is, on plaintiffs' own showing, very substantial, whereas the public interest of the United States is much more modest. According to plaintiffs, the acts complained of resulted in environmental pollution of Ecuador's rainforest regions and other property, and thereby injured tens of thousands of Ecuadorian and Peruvian citizens in their property and/or persons. While, if these allegations are true, the United States still has an interest in not permitting its companies to participate in such misconduct, the uncontested role of the Government of Ecuador in authorizing, directing, funding, and profiting from these activities necessarily lessens the United States' interest in the litigation while further increasing that of Ecuador.

On any fair view of the evidence so far adduced in this case, the alleged preference given by the Consortium to oil exploitation over environmental protection was a conscious choice made by the Government of Ecuador in order to stimulate its economy.[6] The public interest of the United States in second-guessing those decisions is modest indeed. While plaintiffs allege that the piping and waste disposal practices used to implement this choice were "negligent" (in the sense of causing more environmental harm than other, more expensive alternatives available to the Consortium would have caused), they have not adduced anything but conclusory statements to suggest that the Government of Ecuador was unaware of the trade-off; and, in any case, whether or not the Government of Ecuador was or was not aware of these alleged consequences can only be determined, in any meaningful way, if the litigation is brought in Ecuador, where (as noted) the Government of Ecuador can be joined as a party.

---

6. According to the U.S. State Department, "Until the 1970's, Ecuador was an agrarian country dependent on commodity exports.... Starting in 1972, oil development in the Amazon basin fueled a decade of rapid growth, averaging 9 percent annually, that financed expanded public services, state enterprises, infrastructure, and import-substitution manufacturing." 2001 Ecuador Commercial Guide at 4.

While bringing these suits in Ecuador and/or Peru may impose material burdens on the courts there, the well-known congestion of American dockets is undoubtedly greater than that of less litigious societies like Ecuador and Peru. Indeed, in terms of engendering inordinate delays, the history of mass tort class litigation in the United States is not such as to inspire confidence, *see Judicial Conference Report, supra.* On its face, it seems more likely that the individual plaintiffs in the instant cases would obtain any recovery to which they are entitled much faster by bringing the kind of individualized actions that have already been brought against TexPet in Ecuador, and successfully prosecuted to completion there, than by serving as named plaintiffs in the massive lawsuits the U.S.-based plaintiffs' counsel here propose.

As to applicable law, it follows from the facts that Ecuadorian lands and Ecuadorian people are the primary focus of this case that Ecuador's interests in this case vastly outweigh those of New York and that Ecuadorian law will therefore apply to most, if not all of, the claims raised in these cases. *See Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 319, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (N.Y.1994); *Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 201, 491 N.Y.S.2d 90, 480 N.E.2d 679 (N.Y.1985) (citing *Neumeier v. Kuehner,* 31 N.Y.2d 121, 128, 335 N.Y.S.2d 64, 286 N.E.2d 454 (N.Y.1972)). Because the courts of Ecuador are in the best position to find and apply their own law, this factor weighs significantly in favor of dismissal. *See Hyland Therapeutics,* 807 F.Supp. at 1129–30; *Travelers Indem. Co. v. S/S Alca,* 710 F.Supp. 497, 501–02 (S.D.N.Y.1989), *aff'd,* 895 F.2d 1410 (2d Cir.1989); *Abiaad v. General Motors Corp.,* 538 F.Supp. 537, 543 (E.D.Pa.1982), *aff'd,* 696 F.2d 980 (3d Cir.1982).

Finally, as already discussed, the notion that a New York federal jury is better equipped than an Ecuadorian judge to apply Ecuadorian law to Spanish-language testimony and documents relating to 30 years' of activities by an Ecuador-sponsored Consortium in an Amazonian rain forest is preposterous.

■ Plaintiffs argue, however, that this balance of *Gilbert* factors heavily favoring dismissal needs to be re-weighed in light of the fact that, in addition to their more conventional claims, they have also alleged a claim under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, which provides a federal forum for aliens suing United States entities for violations of the law of nations. Whatever the abstract merits or demerits of this argument, discussed *infra,* it is of little relevance to this case, for two reasons.

First, the specific claim plaintiffs purport to bring under the ATCA—that the Consortium's oil extraction activities violated evolving environmental norms of customary international law, *see, e.g.,* Pls.' Jan. 11, 1999 Mem. at 18–19; Pls.' 1996 Mem. at 64–68—lacks any meaningful precedential support and appears extremely unlikely to survive a motion to dismiss. *See Beanal v. Freeport–McMoran, Inc.,* 197 F.3d 161, 166–67 (5th Cir.1999); *Amlon Metals, Inc. v. FMC Corp.,* 775 F.Supp. 668, 671 (S.D.N.Y.1991). As the Fifth Circuit Court of Appeals stated in dismissing a substantially similar claim in *Beanal, supra,* "the [ATCA] 'applies only to shockingly egregious violations of universally recognized principles of international law.' *See Zapata v. Quinn,* 707 F.2d 691, 692 (2d Cir.1983) (per curiam)... [F]ederal courts should exercise extreme caution when adjudicating environmental claims under international law to insure that environmental policies of the United States do not displace environmen-

tal policies of other governments." *Beanal*, 197 F.3d at 167.

Second, even if the ATCA claim had greater facial promise, the discovery already taken in this case has established overwhelmingly that no act taken by Texaco in the United States bore materially on the pollution-creating activities of which plaintiffs complain. This is not a case, then, where the United States was specially used as a base from which to direct violations of international law visited on some foreign site. Conversely, the actions in question occurred overwhelmingly in Ecuador, where courts are fully capable of interpreting alleged violations of international law. The United States therefore has no special public interest, under the ATCA or otherwise, in providing a forum for plaintiffs pursuing an international law action against a United States entity that plaintiffs can adequately pursue in the place where the violation actually occurred.

█ As a more general matter, moreover, the presence of a claim under the ATCA does not alter the standard *forum non conveniens* analysis to anything like the degree suggested by plaintiffs. While "the original purposes of the ATCA remain the subject of some controversy... the most learned exposition of the statute's original purposes ... suggest[s] that the statute was originally motivated by a desire to insure that claims by an alien against U.S. citizens or for incidents occurring in the United States were litigated in federal court rather than state court, so as to prevent the states from mishandling such cases and creating international incidents." *Wiwa*, 226 F.3d at 105 n. 10. *See also Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 782 (D.C.Cir.1984) (Edwards, J. concurring) ("There is evidence ... that the intent of this section was to assure aliens access to federal courts to vindicate any incident which, if mishandled by a state court, might blossom into an international crisis."); *Filartiga v. Pena–Irala*, 630 F.2d 876, 890 (2d Cir.1980) (the kinds of questions that arise under the FTCA "are fraught with implications for the nation as a whole, and therefore should not be left to the potentially varying adjudications of the courts of the fifty states"). While the apparent purpose of ATCA, then, was simply to afford aliens a federal forum in preference to a state forum, the effect of its text is to afford aliens a forum in the United States to assert violations of international law. But nothing in that text suggests that the United States forum should therefore be given preference over a more convenient foreign forum which is adequate to handle the case.

Accordingly, courts have applied *forum non conveniens* analysis to cases involving claims brought under the ATCA in essentially the same manner as applied to all other cases. *See, e.g., In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 978 F.2d 493, 500 (9th Cir.1992) ("Such limitations as venue and the doctrine of *forum non conveniens* are available in [ATCA] cases as in any other."); *Cabiri v. Assasie–Gyimah*, 921 F.Supp. 1189, 1199 (S.D.N.Y.1996) (conducting *forum non conveniens* analysis in case involving claims under the Alien Tort Claims Act); *Eastman Kodak Co. v. Kavlin*, 978 F.Supp. 1078, 1084 (S.D.Fla.1997) (same); *see also Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir.1995) (noting the United States' statement suggesting that ordinary *forum non conveniens* analysis should apply to the ATCA claims there stated).[7]

---

7. Similarly, ordinary *forum non conveniens* analysis has been held to apply to claims under a variety of other federal statutes providing for special federal jurisdiction and/or special venue rules. *See, e.g., Capital Currency Exch. v. National Westminster Bank PLC*,

In support of their contrary position that the ATCA materially alters *forum non conveniens* analysis, plaintiffs point to *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 25 (D.D.C.1998), in which a district court held that *forum non conveniens* review is inappropriate for cases brought under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7). However, that statute applies only where the plaintiff or victim of terrorism is a United States national at the time of the incident, 28 U.S.C. § 1605(a)(7)(B)(ii), so that the United States has a special interest in "ensuring that its citizens have an opportunity to seek redress in the United States," *Flatow*, 999 F.Supp. at 25, whereas the ATCA, by contrast, only applies to alien plaintiffs.

More importantly, the Second Circuit recently had occasion to review the entire issue in comparing the wording of the original ATCA, here applicable, with the wording of an amendment to the ATCA, known as the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 App., that extends jurisdiction under the ATCA to cases brought, not by aliens but by U.S. residents, who have been victims of foreign torture. *See Wiwa, supra*. Based on the wording differences between the original ATCA and the amendment, the Court divined a special United States receptivity to TVPA suits not necessarily present in the case of other ATCA suits. *See Wiwa*, 226 F.3d at 104–05. But even then the court concluded that "[t]his is not to suggest that the TVPA has nullified, or even significantly diminished, the doctrine of *forum non conveniens*." *Id.* at 106. *A fortiori*, the doctrine applies in undiminished fashion to ATCA suits that do not fall within the purview of the TVPA.

Accordingly, even if one assumes for the sake of argument the hypothesis that Texaco participated in a violation of international law that would support the claim here brought under the ATCA, neither that assumption nor any of the other considerations special to these cases materially alters the balance of private and public interest factors that, as previously discussed, "tilt[s] strongly in favor of trial in the foreign forum," *Wiwa*, 226 F.3d at 106 (quoting *R. Maganlal & Co. v. M.G. Chemical Co.*, 942 F.2d 164, 167 (2d Cir.1991)), and, indeed, virtually mandates dismissal in favor of Ecuador or, if any plaintiff prefers, Peru.

For the foregoing reasons, the defendant's motion to dismiss these cases on grounds of *forum non conveniens* is hereby granted. Clerk to enter judgment in both cases.

SO ORDERED.

---

155 F.3d 603, 608–09 (2d Cir.1998) (*forum non conveniens* applies to Sherman Act claims despite special federal venue provision); *TransUnion Corp. v. Pepsico, Inc.*, 811 F.2d 127, 129–30 (2d Cir.1987) (same, for RICO claims); *Cruz v. Maritime Co. of Philippines*, 702 F.2d 47, 48 (2d Cir.1983) (same, for Jones Act claims); *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 431 (9th Cir.1977) (same, for Lanham Act claims); *see generally Gilbert*, 330 U.S. at 507, 67 S.Ct. 839 (*forum non conveniens* available "even when jurisdiction is authorized by the letter of a general venue statute.").